[No. 20455.　Department Two.　June 27, 1927.]

Mary Jones, as . Administratrix of the Estate of
Clarence J. Jones, Deceased, Respondent, v. The
City of Seattle, Appellant, Dominick
Soraci et al., Defendants.[1]

[1] Carriers (80)—Personal Injuries—Negligence—Setting Down
Passengers. A city's paving of a street on only one side of its
street car tracks and allowing two-way traffic thereon does not,
alone, create such a situation of danger to passengers alighting
from its street cars as to render the city liable to one who,
under the circumstances, was bound to take notice of the
danger.

[2] Same (97) — Personal Injuries — Contributory Negligence —
Passenger Leaving Street Car. A passenger alighting from a
street car, and almost immediately struck by an automobile ap-
proaching from the opposite direction, is guilty of contributory
negligence, as a matter of law, where there was two-way traffic
on only one side of the tracks, oncoming cars were driven close
to the car tracks, he was familar with the place, and took no
precautions and did not look to see whether an automobile was
approaching before stepping to the pavement, but took several
steps to cross the street without heed.

Appeal from a judgment of the superior court for
King county, Paul, J., entered August 24, 1926, upon
the verdict of a jury rendered in favor of the plaintiff,
in an action in tort. Reversed.

*Thomas J. L. Kennedy* and *Arthur Schramm,* for
appellant.

*Karr & Gregory,* for respondent.

Tolman, J.—Respondent's decedent was a passenger
upon a municipal street car, operated by the appellant,
on July 11, 1925. The car was going south on West
Marginal Way, a public street, at about 3:30 in the
afternoon. The car track was a single line located in

the middle of the street. The easterly side of the street was unpaved, and west of the car track was a paved strip or roadway nineteen feet wide, which was used by traffic going in both directions. The car was what is known as a "one man car," using a right front entrance only for the ingress and egress of passengers. Oregon street is an intersecting street, but not improved at the point of intersection, and no signs were there maintained to indicate that it was a place at which street cars customarily stopped.

As the street car approached Oregon street, on which street the decedent had lived for some months, and at which point he had frequently before disembarked, the decedent gave the usual signal, arose from his seat in the interior of the car, and advanced to the front platform in order to alight at Oregon street, when the car should stop. At that time, defendant Soraci was approaching from the south, driving an automobile at a considerable speed, and following a line only about a foot or two west of the car track. The decedent alighted from the street car, was struck by the automobile and received injuries from which he died. The particular details surrounding the accident will more fully appear as we proceed.

This action was prosecuted against both the city and the community which owned the automobile, resulting in a verdict and judgment against both in the sum of $17,000, from which the city alone has appealed.

In due course, the city moved for a nonsuit, for a directed verdict, and for judgment *non obstante veredicto,* each of which motions was denied, and as we view the facts, it will be necessary only to consider the errors assigned upon these rulings.

[1] Respondent, in her complaint, alleged and now argues that, by permitting traffic in both directions upon the paved portion of the street, the city created a

dangerous situation, and to support that contention cites *Tobin v. Seattle*, 127 Wash. 664, 221 Pac. 583. In that case, the two-way traffic on one side of the street was but one of a number of conditions and circumstances which, combined, were held to be sufficient to carry the question of negligence to a jury. We have never held, and are not now prepared to hold, that two-way traffic on half of the street alone creates a dangerous situation, and certainly here, where that condition was well known to the person injured, he was bound to take notice of the fact and govern his actions accordingly.

[2] No witness testified that decedent looked for traffic approaching from the south at or before the time he alighted from the street car, or that there was anything to prevent his seeing the true situation, if he had looked. We cannot apply the rule as to presumption of due care, because a number of respondent's own witnesses gave testimony clearly indicating that decedent did not so look. In fact, the great weight of the evidence was to that effect. Perhaps the most favorable testimony was given by a lady passenger upon the street car, from which we quote:

"Q. Where were you sitting that day on the street car? A. I was sitting right in the front on the right hand side. Q. You were sitting near the front of the car? A. Right in the front there, the seat on the side. Q. On the right hand of the car, going out? A. Yes, sir. Q. Did you see Mr. Jones that day? A. I saw him just when he got up for to go out. Q. Was he sitting in the rear of where you were sitting? A. I couldn't tell you where he was. The car was full. Q. I will ask you when you were coming up to Oregon street if you had occasion to, or did, see the automobile driven by Mr. Soraci? A. Yes, sir. Q. How far did you notice that automobile before the car came to a stop, the street car? A. Nearly a block away. Q. You saw the automobile nearly a block away from

Oregon street? A. Yes, sir. Q. How far was the street car, if you know, from Oregon street, where it came to a stop, when you first noticed the automobile coming from the south? A. Well, I couldn't just say the distance, but he stopped just as usual to let him off. Q. I will ask you which way the automobile was going? Was it headed north to the city? A. Yes, sir. Q. On what side of the pavement was the automobile? A. Well, it was right along on the side that the car was on. Q. Do you mean the right hand side of the pavement as you come north? A. Well, yes. Q. On the right hand side of the pavement as you come north? A. Yes, sir. Q. Did you have occasion to keep your eye on that automobile? A. I did. Q. You have ridden in automobiles, have you not? A. Yes, sir. Q. How fast would you say the automobile was traveling? A. Well, I would judge from the one I go in, I think, they were going between thirty and thirty-five miles an hour. Q. Between thirty and thirty-five miles an hour? A. Yes, sir. Q. Did you see Mr. Jones step from the street car on that day? A. Yes, sir. Q. Now, Mrs. Easton, how far from Mr. Jones was the automobile when the motorman opened the gates and let him out onto this pavement? A. It seemed to be right on the gates when he got them opened. Q. You were looking right out at it, were you, at the time? A. Yes, sir. Q. What did Mr. Jones do when he alighted from the street car? A. Well, he just swung off the car, and I guess he saw the machine, from the way he acted.

"MR. MEAGHER: Just a minute.

"MR. GREGORY: Just a minute until he objects.

"MR. MEAGHER: I object to her guessing.

"Q. Well, don't guess; just state positively, if you can. Was there anything to indicate whether or not he saw the automobile? A. Well, he just threw his hand up that way (illustrating), and made a sway to get out of his way. Q. Attempted to get out of the way of the automobile? A. Yes, sir. Q. What did he do in making an attempt to get out of the way of the automobile? A. He gave just a quick jump, like

any person would, to the sidewalk. Q. How far across that pavement did he get, if you know, before the automobile struck him? A. Well, I should think it would be about two-thirds or a little better. Q. About two-thirds or a little better? A. Yes, sir. Q. You had your eyes on Mr. Jones and the automobile from the moment he stepped off the car, did you? A. Yes, sir. Q. There was some testimony here the other day about some screaming. Was that you? A. Yes, sir. Q. What did you scream for? What did you say? A. I saw it strike him, and I thought he would be killed. Q. You saw it strike him? A. Yes, sir. Q. How fast was Mr. Jones going at that time in trying to get out of the way? A. As fast as a man could go jumping.''

On cross examination by counsel for defendant Soraci, this witness testified:

''Q. Where was the car when Mr. Jones jumped off the street car? A. Right on him. Q. Right on him. How many feet from him? A. I cannot just say how many feet it was, but I could see the front of the car when the man threw his hand up. Q. How many feet was he from Jones? A. I cannot attempt to say, because I am no judge of feet. Q. What did you mean when you said it was right on him? A. I don't see how he didn't get struck right then. Q. Well, did the automobile do anything? A. Yes, it swayed out at the same time he jumped. Q. Which direction did the automobile swerve out? A. It swayed out to the sidewalk, towards the sidewalk. Q. You saw it swing away over, did you? A. Yes, sir, it swung—— Q. What is that? A. Yes, sir, it swung out. Q. What did Mr. Jones do about that time? A. Well, he was jumping. Q. He was jumping? A. Yes, sir, or hopping, or whatever you call it. Q. Was he running? A. Well, I don't know what you would call it. Q. He started to run just about the time the automobile swung over, didn't he? A. Yes. Well —— Q. What is that? A. He threw his hand up and made the sway out with the car and then just kept on going. Q. Well, did the car swing off from the place it was on the pavement and go over to-

wards the curb? A. Well, he was going the same way.''

And on cross examination on behalf of the city:

''Q. Now, there wasn't anything to obstruct Mr. Jones' view of this automobile as it came down the street? He had the same view, if he had looked, that you had out of the front window? A. Well, the car was crowded and he came out and went right out. Q. He jumped right out of the car without looking? A. Well, I don't know whether the man looked or not. Q. Do you know which way his face was turned? A. I couldn't tell you. Q. You did not see or you did not notice whether he looked or whether he did not? A. No, sir, I did not. All I saw was his hand go up for the automobile.''

This witness alone testified that Jones saw and realized that he was in imminent peril at the instant of alighting. All others indicate that he had moved an appreciable distance toward the curb before discovering the danger, and, as before indicated, that during the interval he did not look in the direction from which the danger threatened. But assuming that the jury may have found the facts to be according to the quoted testimony, can anyone doubt that Jones was himself negligent?

It cannot be held that the operator of the street car had the whole and sole duty in the premises. No doubt he should not invite a passenger to step into a danger of which the operator knew or should have known and the passenger did not and, by the use of ordinary care, could not know. We cannot hold that, by the law, the operator became the guardian of an adult person in possession of all of his faculties and fully conversant with all of the conditions which might be expected to exist at the point of alighting. But assuming, without deciding, that the question of the operator's negligence was for the jury, there is still

7—144 wash.

left the question of the contributory negligence to be determined upon the testimony most favorable to respondent. Taking, then, that testimony as true, may reasonable minds differ in determining that Jones had full knowledge of the street and traffic conditions; that he had an unobstructed opportunity to see all that the operator of the car could have seen, and that which other passengers, not alighting and whose personal safety was not involved, did see? That he voluntarily alighted in broad daylight, without taking the slightest precaution as to the traffic on the street, and that therefore he was guilty of negligence which proximately caused, or contributed to, the injury? Our recent case of *Lindgren v. Puget Sound International R. & Power Co.*, 142 Wash. 546, 253 Pac. 791, while perhaps not strictly in point, displays a line of reasoning that leads to the answer which we must here give, and that is that, upon the undisputed evidence most favorable to respondent, the deceased was, as a matter of law, guilty of contributory negligence which bars a recovery.

The trial court should have granted some one of the motions which raised this question.

The judgment against the city is reversed, with instructions to dismiss the action as to it.

MACKINTOSH, C. J., HOLCOMB, and PARKER, JJ., concur.